No. 18,806.

BARTON C. WILLIAMS, ET AL., Executors, etc., v.
T. C. STANDER, ET AL.
(354 P. [2d] 492)

Decided July 25, 1960. Rehearing denied August 22, 1960.

Messrs. GORSUCH, KIRGIS, CAMPBELL, WALKER & GROVER, Mr. JAMES H. TURNER, Mr. CHARLES E. RHYNE, for plaintiffs in error.

Messrs. DAWSON, NAGEL, SHERMAN & HOWARD, Mr. JOHN W. LOW, Mr. R. DALE TOOLEY, for defendants in error.

*In Department.*

Opinion by MR. CHIEF JUSTICE SUTTON.

HATTIE M. RUNDELL, Deceased, prior to her death deeded in fee simple to defendants in error, hereinafter referred to as defendants, the following real property located in Grant County, Washington:

Northeast Quarter (NE ¼), Section 11, Township 24 North, Range 30 EMW, and the Southwest Quarter (SW ¼), Section 10, Township 25 North, Range 29 EMW, subject to easements and rights of way of record.

In fact Mrs. Rundell deeded the property at two different times to the Standers, the first being on March 19, 1952, and the second on March 19, 1953. The first deed recited that "This deed to go into effect after the death of said Grantor." The second deed did not bear

such a recitation, however, on the same date (i.e., March 19, 1953) Mrs. Rundell and the Standers executed an agreement relating to the property whereby it was agreed:

"1. That First Party (Hattie M. Rundell) shall have and maintain, during her natural life, all of the rents, profits and all income whatsoever from said land, as her sole and exclusive property, free and clear of any right, title or interest whatsoever of Second Parties (T. C. Stander and Lula Stander).

"2. That upon the decease of First Party, all of the rents, profits and all income whatsoever from said land, shall, thereupon, become the exclusive property of Second Parties or the survivor of them.

"3. That, during the natural life of First Party, she will pay all just charges, taxes, assessments or other claims whatsoever against the above mentioned land, and she shall have the sole and exclusive control and management thereof." (Names in parentheses added.)

The parties appearing before this court agree that the effect of the second Rundell deed construed together with the agreement, as it should be, is that Mrs. Rundell had retained a life estate in the above described real property, thereby causing it to be included in the value of her gross estate for the purpose of determining the United States Estate Tax thereon in accordance with Section 2036 (a) Title 26 U.S.C., entitled "Transfers With Retained Life Estate." It also appears that the entire value of the property may be subject to the inheritance tax laws of the State of Washington.

On or about December 10, 1954, Mrs. Rundell entered into two farm leases, which appear in the record, each lease providing for a term beginning with the summer of 1955 and ending after the harvest in 1956, at a rental of one-third of the crop.

She died on May 30, 1956, and on that date there were crops growing on the leased premises which had been planted between March 31, 1956, and April 7, 1956. These

crops were harvested on or about July 1, 1956, and the lessor's share was sold and the proceeds of the sale in the sum of $4227.81 were delivered to Mrs. Rundell's executors.

On March 18, 1953, one day before Mrs. Rundell executed the deed of March 19, 1953, and its corrollary agreement, she executed her last will and testament, which is also in evidence. The pertinent part of her will is Article Second which directed her executors to pay certain taxes out of her estate. It reads:

"I direct that any and all legacy, succession, inheritance and estate taxes payable in respect to my said estate, or to any devise, legacy or distribution under this Will, or otherwise, by reason of any law or laws now or hereafter in force, be paid by my executors or their successors out of my estate as an administrative expense thereof."

The issues presented to the trial court were:

1. Under the above fact situation is it the estate of Mrs. Rundell or the Standers who are liable for the United States Estate Tax with respect to the real property described?

2. Which parties are liable for the inheritance taxes, penalties and interest, if any imposed by the State of Washington, with respect to said real property?

3. Which parties are entitled to the income from the sale of the landlord's share of the crops grown during the term of the farm leases on the property demised by said leases?

There being no dispute in the evidence, motions for summary judgment were filed by both parties below, orally argued, written briefs submitted thereon, and on June 24, 1958, the trial court rendered its written findings of fact and a decree which held in favor of the Standers and against the executors on all issues.

The executors are here by writ of error urging reversal upon grounds which can be summarized as:

1. That the court's finding and conclusion was erron-

eous in holding and determining that Article Second of Mrs. Rundell's will, coupled with her conveyance of the Washington property, the day after the execution of the will, together with the omission of the Washington property from her will, shows a clear intention that the United States estate tax and Washington inheritance tax attributable to Mrs. Rundell's interest in the afore-described real property is to be paid by the executors from the probate estate.

2. That it was erroneous for the court to find that paragraph 2 of the "Agreement" is controlling, and that the doctrine of emblements applies to this case contrary to the finding of the trial court, and that the Standers are not entitled to the proceeds of the crop harvested after Mrs. Rundell's death.

We proceed then to consider these two basis for alleged error.

*First: As to who pays the estate and inheritance taxes:*

In reading Article Second of Mrs. Rundell's will it is clear that she intended to include in the taxes payable by her executors not only those due on "any devise, legacy or distribution under this Will," but also all "inheritance and estate taxes payable in respect to my said estate." Having used these two terms in the conjunctive does not mean that she was excluding the property received by the Standers. In fact we are at a loss as to how else she might have described her desire that her estate bear all taxes unless she would have gone back through the years and listed previous gifts or transfers during her life time. It is common knowledge that the latter type of procedure is not customary or to be expected of testators. To hold otherwise would be giving the will a strained construction that is not permissible. *Palmer v. Palmer* (1944), 135 N. J. Eq. 516, 39 A. (2d) 438. In the latter case the court said:

"Courts are bound to regard words in their usual and most known signification according to their natural and reasonable meaning."

It is also well settled that a will must be construed to give every word meaning. *Hickey v. Costello,* (1927), 80 Colo. 461, 251 Pac. 595. This doctrine is summarized in 57 Am. Jur. 723, §1129, as follows:

"It is presumed that every word is intended by the testator to have some meaning; and no word or clause in a will is to be rejected to which a reasonable effect can be given. *Where two constructions are suggested, the one disregarding a word or clause of a will, and the other giving effect to the will as a whole, the latter must be adopted.*" (Emphasis added.)

■ Applying the principles above set forth, Article Second of the will must be construed to apply to the testatrix's entire taxable estate. To construe this article otherwise would be to do violence to the cardinal rule of construction of wills that no clause or word in a will is to be rejected to which a reasonable effect can be given. As construed by plaintiffs in error, the words "or otherwise" would have to be disregarded completely and Article Second of the will would have to be read as though these words had never been included. On the other hand, if the words "or otherwise" are to be given their usual and most known signification according to their natural and reasonable meaning, they must embrace the non-testamentary transfers, including the Washington property.

There is almost unanimous agreement among the courts that where language such as that found in Article Second is involved, the word "or" is held to be disjunctive and not conjunctive. The obvious and logical result is that phrases separated by the disjunctive "or" cannot be given synonymous meanings. If the phrases "in respect to my said estate" and "or to any devise, legacy or distribution under this will" and "or otherwise" were construed as to include only the testatrix's probate estate, one or more of the phrases would then be only a repetition of the other. This would not only be an illogical and forced construction of the language contained in

Article Second, but also would be contrary to the general rule of construction of wills that meaning is to be given to each word or clause of a will.

The importance of the use of the disjunctive "or" is summarized in 37 A.L.R. (2d) 69. A leading case involving a will clause somewhat similar to Article Second is *Matter of Aldrich* (1940), 259 App. Div. 162, 18 N.Y.S. (2d) 420. This case involved an estate where part of the testator's property passed outside the will by way of two inter vivos trusts. The will in the *Aldrich* case provided:

" * * * all legacy transfer inheritance succession or other estate taxes, which may be assessed or imposed upon any of the gifts legacies devises or provisions contained in this my Will *or upon my Estate* shall be paid by my Executors out of and charged against the principal of my residuary estate as an expense of administration." (Emphasis added.)

The court held that the words "or upon my estate" applied to the property passing outside the will and in concluding that all taxes must be paid from the residuary estate stated at page 164:

"It is reasonably clear that the intention of the testator in using the words 'or upon my Estate' in paragraph 'Seventeenth' of the will, following the designation of various taxes, was that all taxes, including those assessed by reason of his relationship to the trusts should be paid out of the residuary estate; and we so hold * * * ."

*Kapnek v. Kapnek* (1955), 38 N. J. Super. 268, 118 A. (2d) 701, involved an action by the executors and trustees to recover from certain beneficiaries the amount required to pay inheritance taxes, estate taxes and administration expenses. The will in this case provided:

"I direct that all estate, inheritance and succession taxes, on property passing *under this will or otherwise,* upon my estate, shall be paid out of principal thereof, to the same effect as if said taxes were expenses of ad-

ministration, and all legacies, devises, and all other gifts of principal or income made by this will or any codicil hereto, or chargeable to such estate on account of any transaction included in any calculation for any such tax purposes, shall be free and clear therefor." (Emphasis added.)

With respect to the intention of the testator in using the language above set out, the court said at page 702:

"The normal presumption arising under the Internal Revenue Code and the decisions interpreting the same, except under the foregoing circumstances, is that the tax should be paid out of the residue of the estate, without reimbursement from the beneficiary.

" * * *

"Here, plainly, the testator intended that all such taxes, whether state or federal, levied upon property which passed 'under this will or otherwise' should be paid out of the principal of his estate. This demonstrated an intent to have all taxes paid by his estate, if possible."

This case was decided some fifteen years after the decision of *Morristown Trust Co. v. Childs* (1940), 128 N. J. Eq. 524, 17 A. (2d) 559, which is relied upon by executors. Only because the residuary estate in the *Kapnek* case was insufficient to pay the taxes was the property passing outside the will subject to any payment of estate taxes.

*Second: As to who receives the harvested crop proceeds:*

It was in 1954 that testatrix entered into the farm leases in question so we must assume that she did so fully cognizant of her previous contract with the Standers. Again we must say that we cannot see how testatrix could have made her wishes any more fully known about "rents, profits and all income whatsoever from said land" than she did in her agreement of March 19, 1953. And, that it was her wish and agreement they were to "become the exclusive property of the Second

Parties (the Standers) or the survivor of them," leaves no room for dispute.

Even in jurisdictions which recognize the rights of a life tenant's estate to profits from crops growing on land at the time of the life tenant's death, such wording has been held to abrogate any such rights of the estate. Thus in *Wilhoit v. Salmon* (1905), 146 Cal. 444, 80 Pac. 705, there was a controversy involving growing crops at the time of the life tenant's death. There the grantor conveyed land by deed in escrow to be delivered to the remaindermen upon her death. The language in the deed described the land and included "rents, issues and profits thereof," such language being similar to the language employed by the testatrix and Standers in the agreement involved here. The court held that because the grantor had used the words "rents, issues and profits thereof" in the deed, that when the grantor died, *eo instanti*, all of her interest in the reserved estate, including growing crops, ceased and passed immediately to her grantees.

To the same effect is *Waugh v. Waugh* (1877), 84 Pa. 350, 24 Am. Rep. 191, where the grantor (life tenant) leased land (payable in crops) and died while the crops were growing thereon but before harvest. This case is similar to the instant situation in that the deed from the grantor was broad in its terms and gave the rents, issues and profits thereof and all rights, claims and demands whatsoever in the land to the grantees upon the grantor's death. The court held that by the terms of the deed, the grantor had divested his estate of any right to profits from the crops.

In *Lloyd v. First National Trust and Savings Bank of Fullerton* (1951), 101 Cal. App. (2d) 579, 225 P. (2d) 962, a will was involved which gave a life tenancy to a sister and on the sister's death income to the remaindermen. An orange crop was growing on the land at the time of the sister's death and the question arose whether

the remaindermen or the sister's estate was entitled to the income from the crops. The court held that the entire income from the crops must go to the remaindermen and not to the sister's estate. The court pointed out that the single word "income" meant that the land as well as the growing crop belonged to the remaindermen on the life tenant's death. See also *Miller's Executrix v. Miller* (1949), 310 Ky. 721, 221 S.W. (2d) 654.

The agreement between testatrix and the Standers speaks for itself. The testatrix retained all rents and profits during her lifetime, but upon her death all rents, profits and income whatsoever became the exclusive property of the Standers.

Though no further reason is needed as to why the Standers are entitled to the crops, an additional reason does exist. It is simply this: If a life tenant has leased the land for rents payable by part of the crops to be harvested, and the life tenant dies before the crops are harvested, the rent belongs to the remainderman and not to the estate of the life tenant. Thus even without section 2 of the agreement the Standers would be entitled to these crop proceeds.

In *Jennings v. Hembree* (1919), 71 Ind. App. 370, 124 N.E. 876, the life tenant who had leased the land died prior to harvest time. The court held that since there was nothing due the lessor until harvest time, the rent belonged to the remainderman and not the estate of the life tenant. In reaching this decision the court cited the following language from *Frame's Estate v. Frame* (1911), 48 Ind. App. 481, 483, 96 N.E. 35, 36:

"Rents due to a life tenant at his death are collectible by his personal representative. Rents have not accrued until they become due, and grain rent, to be paid at threshing time, does not become due until that time. Rents, until they become due, are annexed to the real estate, and thus go with the reversion to the remainderman."

The court concluded in the *Jennings* case, stating at page 878:

" * * * In this case the decedent was to receive her rental for such lands so rented to said tenants in the following portion of crops, to wit: One-third of the corn raised on certain portions thereof, and one-half of the corn raised on the remainder thereof, and each said rental was to be harvested and delivered to said decedent in a crib on said premises at gathering time, about December 15, 1915. There was, then, nothing due to the decedent as rental until the gathering time, about December 15, 1915. This being the case, such rents were annexed to the real estate, and went with the reversion to the appellants as remaindermen."

See also *Osborne v. Osborne* (Tex. Civ. App. 1911), 138 S.W. 1062.

The leases involved here expressly provided that the lessor's rental was one-third of the crop, payable by delivery to the elevator. At the time of the testatrix's death the crops were growing and had not been delivered to the elevator. Under the terms of the leases no rent was due the testatrix at the time of her death.

The importance of the time when the rent becomes due is illustrated by *Grotefendt v. Schlaeppi-Siever* (1919), 213 Ill. App. 436. In that case the testator rented land under an agreement similar to the agreement of March 1953. The testator died while the crop was growing and devised a life estate to his wife and the remainder to his children. Subsequently the crop was put in shock in the field but was not threshed or delivered when the wife died. Nevertheless, the court held that the remaindermen were entitled to the proceeds because the rent was not payable until the wheat was delivered to the elevator. This is exactly the situation in the instant case.

The Washington court has had occasion to consider the rights of the remainderman to rents and income and has held that the right to such rent and income vests in

the devisee or reversioner at the instant of the testator's death. In the case of *In Re Patrick's Estate*, (1938), 195 Wash. 105, 79 P. (2d) 969, a residuary heir objected to an order to sell land to satisfy the claims of a creditor on the ground that the right to the rents, issues and profits from the land vested in the residuary heir at the instant of the testator's death. The court held in favor of the residuary heir, stating in substance that the right to the rents, issues and profits was not retained following the testator's death, but vested at once to the devisee. See also *In Re Henderson's Estate* (1955), 46 Wash. (2d) 401, 281 P. (2d) 857.

Other matters relating to the points at issue have also been considered by us and we find them to be without merit.

The judgment is affirmed.

MR. JUSTICE FRANTZ and MR. JUSTICE DOYLE concur.